EDWARD HALL v. BUXTON LAYTON AND OTHERS.

Where the testimony related to fraudulent representations, the Court said: It is, however, the evidence of a single witness, and he swearing to a conversation between the parties, in which it does not appear that he participated, or that his attention was requested, or in any particular way attracted. Such evidence, though competent, is always received with caution, and subjected to severe scrutiny, because of the great probability of the witness being mistaken in part, or not correctly understanding or correctly hearing the conversation, and the difficulty, if not the impossibility, of disproving it.

A trust in lands cannot be proved by the testimony of a single witness, swearing to the verbal declarations of the alleged trustee, unless there be strong corroborating circumstances.

This principle was held to apply, where there was an agreement between the owner of land scrip and a locator, for the rescission of their contract for the location of the scrip and the return of a like amount of scrip by the locator, and the owner of the scrip offered to prove that the locator obtained the contract of rescission by fraudulently representing that the scrip had not been located and was in the hands of a surveyor in a distant part of the State, whence it was difficult to obtain it, whereas it had in fact been located and patented by him on Galveston Island in his own name.

Appeal from Galveston. Tried before the Hon. Nelson H. Munger.

Suit March 20th, 1848, for land on which it was alleged that defendant had located plaintiff's scrip. In 1838, Layton & Co. placed five pieces of land scrip, for 640 acres each, in the hands of Hall for location; Hall to pay all expenses of making the location and procuring the titles, and to have one fourth of the land for his services. At that time, Bryan & Hall were in partnership in the land business, and had in their hands (including the five pieces belonging to the Laytons) scrip for over 21,000 acres, in part belonging to them, and in part held by them on contract to locate. The pieces were all of the Bryan & Toby scrip, differing only in their numbers, each be-

ing for 640 acres, and each having been transferred under Bryan and Toby's indorsement in blank.

Franklin & Watrous entered into an arrangement with Bryan & Hall for making locations on Galveston Island, by which the latter were to furnish the scrip, the former to contribute their services, and all to share equally in the success of the enterprise. The whole of the scrip held by Bryan & Hall (the blank indorsements having been filled up with Hall's name) was placed in the hands of the surveyor, who commenced the surveys; and Hall advised Layton & Co., by letter dated April 12th, 1839, that he had located their scrip on Galveston Island, by the best advice, and was awaiting the action of government to obtain the patents, "which, if accomplished, will be very valuable."

Shortly after this, Levi Jones, claiming a prior and better right to the land, sued out an injunction restraining the parties from proceeding further with their surveys. A compromise was then effected, by which it was arranged that Jones should have a one-half interest in the enterprise, that the scrip in Hall's name should be used in making the location, and that the patent should be taken in the joint names of Jones and Hall, Jones agreeing to return to Hall scrip equal in value and amount to one-half of the quantity required for the location.

The surveys then went on, and scrip for 18,215 acres, (including the five pieces of Layton & Co.,) was used in making the locations. The balance of the scrip, amounting to over 3,000 acres, returned to Hall, was by him, as witness understood, placed in a Surveyor's hands, to be located on islands further west.

On the 28th of Nov., 1840, a patent was issued to Jones and Hall for the 18,215 acres. A few days thereafter, Congress, by joint resolution, declared that the islands were not subject to location.

Afterwards, there was a partition between Jones and Hall, under a decree of the District Court of Galveston County— the land being divided equally between them by alternate sections.

In 1844, (after the partition between Hall & Jones,) Hall was called upon by Buxton Layton, a member of the firm of Layton & Co., for an account of their scrip. The result of the interview was, that Hall returned to Buxton Layton scrip for 3,200 acres, and that Layton surrendered to Hall the latter's receipt for the original five pieces of scrip, embracing the contract for their location.

The present suit was brought in March, 1848—plaintiffs setting out their contract with Hall, his location of their scrip on Galveston Island, as well as of the other scrip held by him and Bryan, the compromise with Jones, and the partition between him and Hall under the decree of the District Court; alleging that Hall had taken advantage of B. Layton's ignorance of the correspondence between Hall and Layton & Co., and by falsely representing that the five pieces of scrip had not been located, but had been placed in the hands of a Surveyor in the western part of the State, by whom they had been lost or mislaid, had prevailed upon B. Layton to accept an equal amount of scrip as collateral security for the return of the original five pieces, or for the performance of his contract to locate them, and to surrender to him the receipt he had given for those pieces, and the contract relating to them ; offering to return to Hall the scrip which he had delivered to B. Layton ; and praying for a decree awarding them 2,400 acres of the land allotted to Hall in the partition between him and Jones, and also for an injunction to restrain Hall from selling the land pending the suit.

By an amendment, plaintiffs averred their inability to return the scrip delivered by Hall to B. Layton, and prayed that they might be allowed to account to Hall for its value.

Hall answered under oath, admitting most of the allegations

in the petition, but denying the charges of fraud and false representations, setting out the embarrassments attending the location, and the interest of Bryan, Watrous and Franklin in the land, alleging that he informed B. Layton, that he had not been able to make the scrip available for the number of acres authorized to be located by it, and that the attempted location was involved in doubt and litigation, and averring that the scrip delivered by him to B. Layton, was not given as collateral security, but in lieu of the return of the original scrip, and was accepted by B. Layton in satisfaction of the original contract of 1838, which was then cancelled and his receipt surrendered to him by B. Layton.

Deposition of John Williams : I know the parties ; have been book-keeper for Layton & Co. since 1841. The firm of Layton & Co., in the year 1836 and 1838 was composed of Robert Layton, N. C. Hyde, Buxton Layton and Thomas Layton. Robert Layton died July 14th, 1841. The interest of N. C. Hyde was purchased by the remaining partners, February 26th, 1839. (Here witness describes the scrip and the terms of contract with Hall for its location, as alleged.) Hall's receipt, showing the terms of the contract, was always kept in a tin box containing the valuable papers of said firm. In the summer of 1844 Buxton Layton called on Mr. Hall for an account of the scrip. Mr. Hall stated that the scrip was in the hands of the Surveyor and had been mislaid ; that he could not find the Surveyor, to get the scrip. Mr. Hall then gave Mr. Layton other scrip as security for the original 3,200 acres, until he (Hall) could get the original 3,200 acres to return to B. Layton. Mr. Hall then asked for his (Hall's) receipt to be given back to him, or given up, as he had given 3,200 acres of scrip as security for the return of the original 3,200 acres entrusted to him. Mr. B. Layton then returned to Mr. Hall the receipt Hall originally gave for the 3,200 acres. No entry was made of the scrip in the books of Layton & Co.; Hall's receipt was the only voucher and memorandum of the same.—

*Hall*, in his letter, (original hereto annexed as a part of my answer,) dated Houston, April 12th, 1839, acknowledges having located the scrip for 3,200 acres for Layton & Co., on Galveston Island. I heard Mr. Hall tell Mr. Buxton Layton that the original scrip was in the hands of the Surveyor, who was then somewhere in the back part of Texas, and that he could not find said Surveyor, to get from him the original land scrip to return the same to Layton & Co. Mr. Hall also stated that he was afraid the scrip was lost or mislaid. The conversation took place during (the summer, I think, of) the year 1844. Mr. Thomas Layton was absent in England at the time. Previous to that time the correspondence of Layton & Co. had been attended to by Mr. Thomas Layton. Mr. Buxton Layton never attended to the correspondence of the firm. When Mr. Thomas Layton returned and was informed of what was done, he was surprised, and referred to Mr. Hall's letter of 1839, on file, same hereto annexed. It appeared also, from this witness's testimony, that Layton & Co., received their five pieces of scrip in payment of certain articles of Ship Chandlery, &c., supplied by them for the use of the Texas Navy.

The plaintiffs also proved by Williams and Ayres, that they had placed the scrip which they received from Hall, in the hands of an attorney at law, for the purpose of having suit brought against Hall, and that they could not get it back again. Plaintiffs gave in evidence the Act of the Legislature, passed in 1854, confirming the patent to Hall and Jones. (The Act of February 21st, 1848, requiring the Attorney General to bring suit to try the validity of said patent, and the suit and judgment therein against the patent, affirmed by a special Court, were not in evidence.)

On the part of Hall, proof was made of the contract with Franklin and Watrous, and of the partition, by decree of Court, in suit commenced in 1849, between them and Hall and Bryan, of the land allotted to Hall in his previous partition

with Jones,—leaving one quarter of the land, as his and Bryan's portion of the location.

There was proof that the average value of land down the Island was, at the time of the trial, about $9 an acre, and that land scrip was then worth from 30 to 50 cents an acre. But Trueheart, County Surveyor, testified that " there was always " a cloud on the title under the patent to Hall and Jones until " very recently ; that in 1844, these island lands, in consequence, " had no particular value ; that it was considered and believed " by the more intelligent portion of the community, and com- " monly talked, that the title was still in the Government, and " did not pass under the patent to Hall and Jones : it was gen- " erally understood that the title was doubtful ; that in 1844, " he would not have purchased the lands at any price, to have " paid the money—there was, in fact, no sale of the lands at " that time ; that it was not until very recently that these " lands began to rise very much."

Franklin testified that " there had always been a question " as to the title under the patent to Jones and Hall ; he hard- " ly knew of any sales being effected in 1844, or previously ; " the land, at that time, had no certain or fixed value ; he had " confidence in the title, others had not ; he could not state " what the land would have been considered worth, but he did " not consider locations on the Island as good, or worth as " much, as good locations in the country."

Special issues were submitted to the jury ; who returned a verdict in accordance with the allegations of the petition.— The finding included the present average value of the land on Galveston Island, and the present value of the land scrip delivered by Hall to Layton & Co. On this verdict a decree was entered against Hall for 2,275 acres of the land owned by him on Galveston Island, "that being the remainder of the " quantity of land to which the plaintiffs are entitled under the " contract of location, after a proportionable deduction in " value has been made, on account of the land scrip received

" by Layton & Co., from the defendant, to be partitioned and " set off to the plaintiffs by commissioners appointed for that " purpose. Motions for a new trial and in arrest of judgment were overruled, and Hall appealed.

*Sherwood & Goddard,* for appellant. The verdict is contrary to the evidence.

I. The transaction between Hall and Buxton Layton, in 1844, was a rescission of Hall's original contract, and a relinquishment by the plaintiffs of all their interest in the location on Galveston Island. The nature of that transaction is too apparent on its face to admit of serious question. (See the former Opinion of this Court, 10 Tex. pp. 58 and 59.)— It *must* have been intended as a *final settlement :* the only question is, was that settlement procured by fraud, so as not to be binding on the Laytons? The facts of the case repel the charge of fraud, for they show that it was wholly unnecessary. There was no motive to prompt Hall to practice deception upon B. Layton, when the facts, as they actually existed, and were proved on the trial to have existed, in 1844, were all-sufficient to have induced and justified the settlement on the part of the Laytons. The uncertainty of the title to the Island location—or rather, the absolute certainty of its being defective, (indeed so radically defective, as it afterwards proved, that it required an Act of the Legislature to give it validity,) and the little value, as well as the unsaleableness of the land, in consequence of the invalidity of the title, are amply sufficient, without the help of any fraud, to account for B. Layton's preference for unlocated scrip.

But while the facts of the case repel the charge, that the settlement was procured by the fraud of Hall, they also afford the strongest presumption that it was coerced from him by the dissatisfaction of B. Layton with the results of Hall's enterprise on Galveston Island, and that Hall consented to annul the contract, and give up his one-fourth interest in 3,200

acres of land, merely for the sake of getting rid of a discontented and disagreeable customer. See the deposition of plaintiff's witness to the effect that B. Layton called Hall to an account of their scrip. It clearly appears that the settlement was neither planned nor solicited by Hall, but exacted from him by Buxton Layton.

To rebut the presumptions arising from the facts and circumstances of the case, and to sustain the allegations of the petition, plaintiffs offer the deposition of a single witness, Williams, who freely swears to the admissions and declarations of Hall to B. Layton, some five or six years after they are pretended to have been made. But, even considered apart from its effect to establish a trust, and regarded simply as proof of the declarations of Hall, the testimony of a single witness will be very closely scrutinized, and rejected as insufficient, if in the slightest degree improbable, unnatural, or inconsistent with the known facts and circumstances of the case. (Logan v. McChord's heirs, 2. A. K. Marsh. ; Malin v. Malin, 1 Wend. 652 ; Lench v. Lench, 10 Vesey, 517 ; Miller v. Thatcher, 9 Tex. R. 484.)

Now Williams' testimony is, upon its face, inconsistent with itself, repugnant to common sense, at variance with all probability, and exactly adapted to bolster up an extravagant and unnatural case.

With regard to Hall's declarations about the scrip being unlocated, and in the hands of a Surveyor, and his fruitless attempts to re-gain possession of it—it is manifest that these had reference to the *surplus* of the scrip embarked in the location of the island, *respecting which surplus these facts were literally true*, as the testimony shows. In the first place, it was natural that Hall should allude to this surplus, in giving an account of his enterprise on Galveston Island, and the difficulties attending the making of locations in Texas : and it was an easy matter for the book-keeper, knowing that Hall had undertaken to locate scrip for the Laytons, and that he

and B. Layton were conversing about that scrip, but not keeping the thread of their conversation, to misapply Hall's remarks about the *surplus* scrip to the five pieces of *Layton* scrip.

In the second place, it is in proof that Hall had previously informed Layton & Co., by letter, of the location of their scrip on Galveston Island ; and it cannot, for a moment, be believed, that, after having so advised them of the location of their scrip, by letter then on file in their store, he would venture to represent to a member of the firm, in the presence of the bookkeeper, (both of whom he would naturally presume to be acquainted with the correspondence and business affairs of the house,) that the scrip had never in fact been located.

The Court will observe that all the evidence in support of the plaintiffs' case, is the deposition of a single, unknown witness, in the employment of the parties for whom he testifies ; and that this testimony, suspicious and unreliable, if not incredible, in itself, is discredited and contradicted by all the other evidence in the case :—also, that the evidence in defendant's favor is that which is derived from the plain intendment of a few simple and undisputed facts, and from those motives which ordinarily influence men, and determine their conduct in the common affairs of life—which evidence, though infinitely more satisfactory and convincing to those who are accustomed to weigh and test it, than such testimony as that of Williams can possibly be, is, nevertheless, precisely that kind of evidence which juries are least disposed, because least competent, to appreciate, and which they are always ready to reject in favor of the positive assertions of a single witness.

It will also be observed by the Court that all the testimony relating to the transaction between Hall and B. Layton, (indeed, nearly all the testimony in the case,) is in writing, so that the jury could derive no assistance, or advantage, from the appearance and demeanor of witnesses, or from casual remarks not appearing in the statement of facts. Thus, the

chief, if not only reasons, which usually disincline an appellate Court to disturb the verdict of a jury, have no application to the present case.

II. If the settlement, in 1844, was procured by fraud, and were therefore void, still Layton & Co. would not be entitled to the quantity of land awarded them by the verdict. As each of the parties interested in the scrip for 21,000 acres, had an interest *in the location* proportionate to his interest *in the entire quantity of scrip,* but no greater—(for it was a partnership adventure in which all the pieces were embarked without any distinction as to their numbers, and the benefit of which should be apportioned among the owners according to their respective shares in the capital stock:) the interest of the Laytons in the location, previously to the partition with Jones, may be determined by the following proportion, to wit:— 21,000:3,200::18,215:2,775 3-7—thus leaving the Laytons an interest in the surplus of unlocated scrip, to the amount of 424 4-7 acres. By the partition with Jones, (which reduced all the interests represented by Hall and Bryan in the location to one-half of their previous number of acres,) the Laytons became entitled to only 1,387 5-7 acres of land, and their share of unlocated scrip was increased to 1,812 2-7 acres. By the partition with Franklin and Watrous, Layton & Co.'s interest in the location was farther reduced to 693 6-7 acres, and their share of unlocated scrip increased to 2,506 1-7 acres. Deducting Hall's one-fourth from the 693 6-7 acres, we have a fraction over 520 acres, as the utmost quantity of land on Galveston Island to which the Laytons could, in any event, lay claim, instead of the 2,275 acres awarded them by the verdict. If they had any other claim against Hall, it was for their unlocated scrip for 2,506 1-7 acres: against which he might set up the scrip for 3,200 acres delivered by him to B. Layton, leaving a balance in his favor of 693 6-7 acres, to be adjusted by a suitable reduction from the 520 acres of land—the amount of the reduction being easily ascertained by estimating the scrip and the land in money.

There is but one question that can arise as to the accuracy of the foregoing calculations and its results, viz : had Hall the authority to embark Layton & Co.'s scrip in the enterprise of locating the island on shares, in the same manner as if it had been his own ?  If he *had* such authority, then, plainly, Layton & Co. are bound by his contracts, and are entitled to only their stipulated proportion of the land, to wit : 520 acres, subject to the above mentioned reduction.  But granting that he had *not* the authority, what follows ?  *Simply, that Hall rendered himself liable in damages to Layton & Co. for the conversion of their scrip, and the value of the scrip at that time, with interest, is the measure of damages.*

The results of this calculation serve to rebut the charge of fraud, and to strengthen our first position.  It appears that, after allowing Layton & Co. their full interest in the *location*, nearly five-sixths of their scrip was still *virtually* unlocated.— Hall might, then, with truth, have explained to B. Layton that far the greater part of their scrip was then unlocated—for though *in fact* located, *in effect* it was not.  Hall had already (and *before* the difficulty and compromise with Jones) informed Layton & Co. of the *actual* location of the scrip : and he states, under oath, that in his interview with B. Layton, (which occurred *after* the partition between Jones and himself,) he told B. Layton "*that he could not make the scrip available for the number of acres authorized to be located by it*"  That Hall should have dwelt upon this virtual failure, in order to exculpate himself from the charge of neglect in securing Layton & Co. their 2,400 acres of land, was perfectly natural, perfectly consistent with the facts of the case, and perfectly compatible with straight forward honesty.  That Williams should have misapprehended Hall's remarks in regard to the *virtual* failure of the location, and construed them as conveying the idea of an *actual* failure, (especially, as the two things were so nearly equivalent in their probable consequences as to Layton & Co.,) is as charitable an hypothesis as *we* feel called upon to suggest, by way of accounting for his misrepresentation of

what transpired on that occasion.   That B. Layton, finding only about 1-6th of the scrip to have been *in effect* located— and that, too, on land the title to which was worse than questionable, and also finding the other 5-6ths to be beyond the reach of both Hall and himself, should have cancelled the agreement, and taken from Hall an amount of scrip equal to that originally intrusted to him, is a plain business transaction, requiring neither explanation, nor the stultification of Buxton Layton, who, it seems, was supposed to be competent to manage the affairs of Messrs. Layton & Co., during his brother's visit to Europe.

*Allen & Hale*, for defendants in error.   VI. That the verdict of the jury was against law can hardly be said, when it does not appear that the defendant required any instructions from the Court ; and that it was against the evidence is difficult to maintain.   There was undoubtedly evidence showing the fraudulent representations of Hall—his deceitful practices upon the ignorance of Buxton Layton—his contrivance to get back the receipt and substitute land scrip.   In fact the whole case shows a design to appropriate the land located for the Laytons, and to gull them into a surrender of his obligation.— Such conduct, on the part of a trusted agent, is sanctioned by no principle of law or morality, and could not authorize a jury to shut their eyes to the evidence and the irresistible presumptions arising from it.

And this Court has frequently decided that it is not sufficient to show that the evidence was merely weak or inconsistent, or unsatisfactory to the Judges here.   As the jury are the judges of the credibility and effect of the testimony ; unless they are glaringly wrong, their verdict, especially in a question of fraud, will not be disturbed ; (Briscoe v. Bronough, 1 Tex. R. 326 ; McGimpsey v. Ramsdale, 3 Id. 344 ; Latham v. Selkirk, 11 Id. 314 ;) and especially where there have been two trials and two verdicts in favor of either party. (Duggan v. Cole, 2 Id. 396.)

Vol. XVI.            18

LIPSCOMB, J.   The first question we propose discussing in this case is, whether the settlement between Hall and Buxton Layton, and the receipt of Hall surrendered to him by the said Layton, were procured through the fraudulent representations of Hall?

2ndly.   Assuming the hypothesis, that it was procured by fraud, is there any error in the decision of the Court below in this case?

When this case was before us at a former Term, (10 Tex. R. 55,) we reversed it, on the ground that evidence offered by the defendant in the Court below had been improperly ruled out, and that the question of the fraud of Hall had not been distinctly presented to the jury and found by their verdict.   We said " *But we are not satisfied with the evidence of fraud ; and* " *in the absence of fraud on the part of the defendant, we are* " *clear that the plaintiffs were not entitled to a recovery at all.*" The case comes before us now without any additional evidence of fraud on the part of Hall, but with the finding of the jury, of fraud, on the question being distinctly presented to their consideration, and with the evidence on the part of the defendant, that had been excluded from them on the former trial.

The jury having, by their verdict, found fraud in Hall, in procuring the settlement and the surrender of the receipt, their verdict is conclusive, if the evidence upon which they found is sufficient to support it.   The only evidence is that of Williams, the book keeper of the Laytons, who testifies to a conversation between Hall and Buxton Layton, in 1844.   He swears that Hall, when asked by Layton to account for the scrip that had been placed in his hands for location, or for a return of it, stated to him that it was in the hands of a surveyor out west, and he feared that it had been lost, and offered to place scrip to the amount of 3200 acres in the hands of Layton, as security to him for the return of the scrip belonging to Layton & Co., and that he did give that amount of scrip

to him, and asked for and received the receipt which he, Hall, had given to Layton & Co. for their scrip.

Now, if this witness is correct, it would fix the fraud upon Hall, in suppressing the fact that it, or a part of it, had been located upon Galveston island, and in falsely saying that it was in the hands of the surveyor out west, and he feared that it would be lost. It is, however, the evidence of a single witness, and he swearing to a conversation between the parties, in which it does not appear that he participated, or that his attention was requested, or in any particular way attracted. Such evidence, though competent, is always received with caution, and subjected to severe scrutiny, because of the great probability of the witness being mistaken in part, or not correctly understanding, or correctly hearing the conversation ; and the difficulty, if not the impossibility, of disproving it. That this is the character of such evidence, we will refer to some of the cases to which our attention has been called by the appellant's counsel.

In Law v. Merrills (6 Wend. 227,) Walworth, Chancellor, says, " Evidence to establish a fact, by the confession of a par- " ty, should always be scrutinized and received with caution, " as it is the most dangerous evidence that can be admitted in " a Court of justice, and the most liable to abuse. Although " a witness is perfectly honest, it is impossible, in most cases, " for him to give the exact words in which the admission was " made, and sometimes even the transposition of the words of a " party, may give a meaning entirely different from that which " was intended to be conveyed to the witness."

In Logan v. McChord's Heirs, (2 A. K. Marshall,) the Court says, " Confessions are competent testimony, but frequently " ought to be received with caution, because they may be par- " tially remembered, and are more easy to be procured by im- " proper means, and are frequently shielded from disproof."

In Malin v. Malin, (1 Wend. 652,) Judge Sutherland remarks, " It has often been said by Judges and by elementary

" writers, that proof of the declarations or confessions of par-
" ties, is the most unsatisfactory species of evidence, on account
" of the facility with which it may be fabricated, and the im-
" possibility of contradicting it. And because the slightest
" mistake or failure of recollection may totally alter the effect
" of the declaration."

In the case of Tuberville v. The State, (4 Tex. R. 128,) we
recognize the danger of this kind of evidence, and the caution
with which it should be received. In the case under consider-
ation, Williams, with the honest intention of swearing to no-
thing more nor less than the truth, and with no disposition to
color or distort the language used, might so easily have been
mistaken, from failure of memory or from not hearing all that
was said ; and if the conversation was relative to the balance
of the scrip, left undisposed of by the arrangement with Jones,
if he did not hear the whole of the conversation, it was easy and
natural for him to believe that it referred to the original scrip
received by Hall from Layton & Co. The circumstances in no
particular corroborate the evidence of Williams ; so far from
it, they are calculated to weaken and much impair, if not de-
stroy it. The presumption is, that he must have been apprised,
at the time of the supposed conversation between Hall and
Buxton Layton, of the existence of Hall's letter, which was
proven by him. He does not swear when he first became ac-
quainted with the fact of the existence of the letter ; and hav-
ing been the book keeper for so long a time, for the firm of
Layton & Co., it would be strange if he did not know it ; and,
knowing it, still more strange, that he did not make it known
to Buxton Layton, when he heard Hall make a statement whol-
ly inconsistent with it, when it would have proven the falsity
of Hall's statement. His situation and employment as the
book keeper of the firm of Layton & Co., when swearing to
the fact of Hall's verbal declarations resting entirely on his
memory, without the means of its being contradicted, does not
strengthen, but rather weakens, his credibility ; and in review-

ing his evidence, there will be strong grounds to believe that some of the facts sworn to by him, were not from his own personal knowledge, but derived from the Laytons. It is not a reasonable presumption, that Buxton Layton did not know of the location of the scrip on Galveston island, which information had been given to his firm by Hall's letter; if he did not know of it, he ought to have known it, and it would be productive of much injury, to permit one member of a firm to plead ignorance of a fact, of which the firm had written evidence, and thereby set aside a settlement made by him for his firm. It would disturb and destroy the security of every settlement with a member of a firm, and shake the stability of the rule, that the acts of each member of the firm, so far as relates to the legitimate business of the concern, are binding upon all of the firm. It would be still more unreasonable to suppose that Hall would have the temerity to make a declaration, when he must have known that his own letter furnished proof of its falsity. It is much more rational to believe from the facts, that if Buxton Layton ever did enquire of Hall what had become of the scrip, that it referred to the surplus scrip, after the arrangement had been made with Jones; and if Hall did say that the scrip was in the hands of a surveyor out west, that he referred to that surplus scrip.

We have seen that the charge of fraud, by which the original trust is sought to be re-established, is supported by but one witness, unsupported by a single corroboratory fact in evidence, and under circumstances that would scarcely have been regarded sufficient to sustain the finding by the jury, of the truth of the charge in any case.

It has been supposed, that the great disproportion in the value of the land located upon, on Galveston island, and the value of the scrip for which the receipt was given to Layton & Co., and given up to Hall by Buxton Layton, raises a strong and conclusive evidence of fraud. A reference to the evidence will show, that there is not the slightest ground to support

such an assumption. It shows that in 1844, when the settlement was made between Hall and Buxton Layton, the land located upon by the scrip, and for which Hall and Jones had received the patent, was not regarded as of any value, the general opinion being, that Hall and Jones could not hold the land under their patent, and that the land still belonged to the Republic, and that most persons would have preferred well located land scrip any where else to the title under the patent; and the evidence of the high valuation had reference to the value at the time of the trial.

We believe, however, that the question should be put upon a higher and more certain ground. We cannot, in principle, distinguish this case from the common one where a trust is attempted to be proven by oral evidence of the admission, or declarations of the trust, orally made by the trustee. When placed upon this footing, the case is relieved from all embarrassment or difficulty. The question as to what evidence was sufficient to establish a trust, by the verbal declaration of the maker of the trust, in opposition to the oath of the trustee, was thoroughly investigated by this Court, in the case of Miller v. Thatcher, (9 Tex. R. 484,) and after looking to the authorities, both English and American, we decided, in strict conformity with those cases, that it could not be supported by the evidence of a single witness, unless there were strong corroborating circumstances of what he had sworn. We do not propose to enter again into the investigation of the question, for the purpose of vindicating our opinion. We will only cite the remarks of the Master of the Rolls, Sir William Grant, in the case of Leach v. Leach, 10 Vesey, 517, quoted with approbation by Chancellor Kent in Boyd v. McLane, (1 John. Chan. 590.) "How is the fact made out? There is no material ev-"idence but that of the trustee, who is made a competent wit-"ness by a release. She swears to no fact or circumstance "capable of being investigated or contradicted; but merely to "a naked declaration supposed to be made by the husband

" himself, admitting that the purchase had been made with the
" trust money.   That is, in all cases, most unsatisfactory evi-
" dence, on account of the facility with which it may be fabri-
" cated, and the impossibility of contradicting it.   Besides, the
" slightest mistake or failure of recollection may fatally alter
" the effect of the declaration."   We believe, therefore, that
the Court erred in refusing to grant the motion to set aside
the verdict and grant a new trial.

If the evidence had been sufficient to support the finding of
the jury, we would have reversed the decree, because we be-
lieve that if Layton & Co. could have recovered any land on the
locations upon Galveston island, they could not in equity have
been entitled to more than a pro rata of what Hall received,
himself, on the compromises shown in evidence.   Equity will
not tolerate the throwing the whole loss upon Hall.   The judg-
ment and decree is reversed and remanded.

Reversed and remanded.

WHEELER, J., dissenting.   When this case was before us on
a former appeal, I did not concur in its disposition ;   and in-
tended to have expressed my view of the case in a written
opinion, but the claims of other causes prevented.   I then
thought, as I now think, that the opinion and judgment pro-
ceeded in a misapprehension of the issues really presented by
the pleadings, and an erroneous application of the law to the
case.   I have as little doubt that the present judgment is
founded in like error of law and fact.   The only material aver-
ment of the petition, denied by the answer, is, as to the false
and fraudulent representations, by means of which the defend-
ant procured the delivery up by the plaintiffs, of his receipt,
and, as he says, a final settlement, by which he was released
from the obligation of his original contract.   This was the
only question, at all material, upon which the parties were at

issue by their pleadings, and on which they went to trial. All the other material averments of the petition were admitted expressly, or were not denied by the answer. The original contract was admitted; so was the delivery up to the defendant of his receipt for the scrip originally received; but that it was procured by fraudulent representations, was denied. The answer states, or rather insinuates, that the settlement was procured by the defendant representing that he had not been able to make the scrip available, by his location upon the island, for its nominal amount, and that the location was involved in doubt and litigation. It turns out, that this representation, as to any pretended litigation existing at the time, was not true in fact. The litigation with Jones about the location, was amicably settled before the patent issued in 1840. The suit for partition between Hall and Jones was amicable; at least, it should have been so; and nothing appears to the contrary. It cannot be pretended that the defendant can justify or palliate the making of such a representation in 1844, by the proof of litigation which did not occur until years after. The evidence proposed upon the former trial, and admitted on the last, to prove the fact of such litigation, was rightly excluded by the Court on the former trial, and ought to have been so held by this Court, for the plain reason that no foundation was laid for its admission in the answer; it was objected to as irrelevant, and for that cause was rightly excluded. The defendant insisted upon the finality of the settlement with the Laytons; denying that it had been procured by fraud. This was the only issue he tendered: upon this alone he rested his defence, and upon it the case was tried. Evidence, which in no way conduced to support the defence, or the issue on his part, was certainly inadmissible. If it had been proposed to prove litigation existing at the time of his alleged settlement with the Laytons, as a justification of the representations he pretends to have made to them; or to prove that he had not been able to render the scrip available for its nominal amount of acres; or that he had

Hall  v.  Layton.

been compelled to incur extraordinary expense and trouble to secure the location, and was therefore entitled to a larger proportion of the land than he would have been entitled to by the original contract, under appropriate issues, the evidence would have been admissible for such purpose. But such were not the issues ; nor was the evidence proposed for any such purpose. It was merely irrelevant, and did not in any way affect the final result. Its admission or rejection, therefore, is of no importance, only that it was made a ground for reversing the judgment, as I think, without reason.

The real objections to the judgment on the former appeal, were, that it decreed a conveyance with warranty, which the law of the case did not authorize ; and the verdict found the value of the land, which was made the basis of a judgment in the alternative for so much money, for which there was no foundation laid by averment in the petition. For these errors the judgment should have been reformed, or reversed, and the proper judgment rendered. But there was no occasion to reverse and remand the cause for a new trial. So much of the finding of the jury as was not within the issues, was mere surplusage, and did not vitiate the finding upon the only material issue in the case, that of fraud in fact. It is true the jury did not find fraud in express terms ; but according to the uniform course of decisions and practice in this Court, the general verdict for the plaintiff included that finding. That was the main and only material issue submitted to the jury ; and their finding was doubtless intended to embrace, and should have been held to embrace it.

I have thus adverted to the questions presented by the record on the former appeal, for the purpose of more readily indicating the grounds of my dissent from the present judgment.

The judgment ought, perhaps, to be reformed, if the pleadings and the attitude which the defendant has assumed upon the record, will admit of it, so as to render the decree more favorable to him. That question, however, as it has become un-

necessary, I do not propose to examine; or to inquire how far a Court of equity will go to accord equity to a party who has not asked it, and persists in refusing to do equity to others.

The principal and material issue upon the last, as upon the former trial, was, whether the settlement with Buxton Layton in 1844, was obtained by fraud; and the question is whether the evidence was sufficient to warrant the finding of the jury upon that issue. I do not doubt that it was. The question was one of fraud in fact. It was a question which it was peculiarly within the province of the jury to decide. They were the exclusive judges of the credibility of the witnesses and the weight of evidence. The law, it has been well observed by Mr. Starkie, has no scales wherein to weigh the different degrees of probability; still less to ascertain what weight of evidence shall amount to proof of any disputed fact. Its business is to define, to distinguish and to apply legal consequences to ascertained facts; but whether a fact be probable or improbable, true or false, admits of no legal definition. The law, therefore, refers the weight of evidence, and the degree of probability to the decision of the jury, who are to be guided by their conscientious judgment and belief, upon all the circumstances of the case. To deny their sole and exclusive right to decide upon the weight of evidence, and determine the issue, where the question is one purely of fact, like the present, would be an invasion of the right of trial by jury, plainly violative of the Constitution and law. The Court is not allowed to charge the jury upon the weight of evidence; nor can it be pretended, that this Court has any more authority than the District Court, to control their finding upon such a question. Accordingly it has been the uniform language of Courts, that where the question is one of fact, the Court will never interpose to disturb the verdict of the jury, if there is evidence which conduces in any degree to its support. The testimony of the witness Williams fully supports the verdict. It is unimpeached. There not only is nothing in the other

evidence in the case to cast doubt or suspicion upon the verity of his statements ; but on the contrary, they are corroborated, in the main, by other evidence and by the answer of the defendant himself. It is wholly immaterial whether, as he says, the scrip was delivered as security for the return of the original scrip, or whether, as the defendant insists, it was delivered upon final settlement. In either case, if the settlement was procured by the fraudulent representations of the defendant, it was void, and did not relieve him from the obligation of the original contract. It appears from the testimony of Ayres, and of Franklin, and from the defendant's answer, that the statements of the witness are, in the main, true. There is no cause to discredit their truth in any particular.

But if we put aside the testimony of the witness altogether, and look to the answer of the defendant, and the uncontroverted facts of the case, it seems equally difficult to resist the conviction that the Laytons were cheated and defrauded. If they had not been deceived and imposed upon by Hall, they would never have delivered up his scrip and released him upon such terms. If they had known that their scrip was located on Galveston island ; that the defendant had obtained from the government a patent for the land ; that he esteemed it very valuable, and that his legal adviser had confidence in the title ; is it to be believed that they would have surrendered up their entire interest in the land for the amount received of unlocated land scrip, worth at the time a few cents per acre ? The suits which ultimately destroyed confidence in the title, were not instituted, nor were they directed by Act of the Legislature to be instituted, until long after this, and after the change of government by Annexation. Hall's efforts to secure the location upon the island, his letter to the Laytons in 1839, and the testimony of Franklin, show very satisfactorily the estimate he placed upon these lands at the time. Had he communicated the facts of the case as he understood them, to Buxton Layton in 1844, I apprehend, there would have been no occasion for this suit.

If there were no positive evidence of fraud, it is sufficiently apparent from the very nature of the transaction and the circumstances of the case. Fraud need not, and indeed it very seldom can be, proved by direct and positive evidence. It may be apparent (says Judge Story) from the intrinsic nature and subject of the bargain itself; such (in the language of another eminent Judge) as no man in his senses and not under a delusion would make, on the one hand; and no honest and fair man would accept, on the other. Such, it seems impossible to doubt, was the bargain or settlement between Buxton Layton and the defendant in 1844.

If it be supposed that the former should have been put upon his guard against the imposition practiced upon him by the defendant's letter of 1839, respecting the location of the scrip, the answer is, that it was not known to him. The correspondence relating to the scrip had been with another member of the firm, who was then absent from the country, and who, upon his return and discovery of the fraud practiced upon him, seems to have lost no time in asserting his rights. Besides, if the contents of that letter was really known to Buxton Layton at the time it was received, it can not be thought strange that it should have escaped his memory after so long a time ; and I do not perceive that it is any extenuation of the defendant's conduct, that, by reason of the plaintiff's forgetfulness or oversight, he was enabled to overreach him in the transaction of 1844. In fine, without commenting upon the facts of the case, which I have no desire to discuss ; or adverting to arguments, by which the true character of the transaction may be kept out of view or disguised, and the decision of the fact wrested from the jury, to whom it properly belongs, it will suffice to say that, upon a due consideration of all the facts and circumstances of the case, it seems impossible to resist the conviction that the plaintiffs were overreached, cheated, and defrauded, in the transaction with one of their firm in 1844.

The doctrine as to what will be sufficient evidence to establish a trust, manifestly has no application to the case. It was

not questioned that the defendant was the agent of the plaintiffs in the location of their land scrip, and in procuring the title. There was no dispute about the facts that constituted him their agent and trustee—holding the title, when obtained, in trust for them. The proof upon this subject, though ample, was unnecessary ; for the facts which constituted the defendant a trustee were fully admitted by the answer. There was and could be no question upon that subject. The question was whether the discharge of the trust had been procured by fraud? That being established, in the language of the Opinion, when the case was before us on the former appeal, "would restore the obligation of the first contract," (10 Tex. R. 59,) or, to speak more accurately, it would leave the obligation of the contract in full force, unimpaired by the fraudulent transaction. It would remove the cloud thereby cast upon the plaintiffs' title. The question of fraud in procuring the settlement was to be determined by the jury, upon the facts and circumstances of the case in evidence before them, just as any other issue of fraud in fact is left to the decision of a jury. The issue being found for the plaintiffs, the legal consequence is, that their rights remain the same as they were before that settlement—unimpaired and unaffected by it. Having been induced by the fraud of the defendant, it was void and without effect upon the pre-existing rights of the parties. This is quite too clear for doubt or controversy. It is indisputable that the rights of the plaintiffs, under the contract, could not be defeated by a cancellation of it, obtained by fraud. It was only necessary to establish, that the cancellation, or settlement, of whatever nature, was so obtained ; and that the plaintiffs have done by the verdict of two juries, upon evidence as satisfactory as ordinarily has been, or can be obtained upon such a question. My opinion, therefore, is that the verdict was well warranted by the evidence, and that the plaintiffs ought to have judgment upon the verdict.

I have thus particularly noticed the state of the record and the

question it presents, because it seemed necessary to an understanding of the grounds of my dissent from the Opinion and judgment of the Court. But the law of the case, arising upon the record, so far as concerns the question whether plaintiffs should have judgment upon the verdict, may be shortly stated thus : The question for the jury was one of fraud in fact, which it is peculiarly their province to decide. There was positive evidence of the fraud. The jury were the exclusive judges of the credibility of the witness and the weight to which his testimony was entitled. Having passed upon these questions and decided the issue, their verdict ought not to be disturbed, and cannot be set aside, without a plain departure from the well established rule of law upon this subject, maintained by the oft-repeated decisions of this Court.